PHILIP DUBUQUE & another[1] *vs.* CONSERVATION COMMISSION OF BARNSTABLE.

No. 01-P-1152.

Barnstable. March 11, 2003. - August 18, 2003.

Present: PORADA, KAPLAN, & CYPHER, JJ.

*Municipal Corporations,* Conservation commission. *Zoning,* Wetlands. *Environment,* Coastal wetlands. *Administrative Law,* Judicial review, Substantial evidence.

In an action in the nature of certiorari following the defendant conservation commission's denial of the plaintiffs' application to build a structure including a pier in an inlet in waters leading to Nantucket Sound, the judge erred in directing the commission to allow the application, where the plaintiffs failed to establish compliance with the commission's regulations on the subject of private piers, or to provide a basis upon which the commission should in its discretion waive compliance. [828-830]

CIVIL ACTIONS commenced in the Superior Court Department on August 20, 1999, and October 15, 1999, respectively.

The cases were heard by *Richard F. Connon,* J., on motions for judgment on the pleadings.

*T. David Houghton,* Assistant Town Attorney, for the defendant.

*Jeffrey P. Allen (Lana Wolfson Sullivan* with him) for the plaintiffs.

KAPLAN, J. The applicants (plaintiffs in this certiorari action) sought permission of the Conservation Commission of Barnstable (commission) to build a structure including a pier in an inlet in waters leading to Nantucket Sound. After a public hear-

---

[1]Patricia Dubuque. The original applicants were Dean and Mary Jo Stratouly. Pending appeal in this court, the Stratoulys moved to substitute the Dubuques for themselves as parties, since "the property" had been conveyed to the Dubuques. The substitution was allowed. Otherwise the record remains unchanged.

ing, the commission denied the application with findings. The applicants brought an action in the nature of certiorari in the Superior Court. That court reversed the commission's decision and directed the commission to allow the application. The commission appealed to this court.[2]

Holding that the applicants failed to establish compliance with the commission's regulations on the subject of private piers, or to provide a basis upon which the commission should in discretion waive compliance, and confirming that the commission acted on reasonable grounds, not arbitrarily or capriciously, we shall reverse the judgments of the Superior Court and reinstate the commission's decision denying the application. (A distinction in our decision between a "recreation" issue and a "contiguity" issue will be explained *infra*.)

## ISSUE REGARDING RECREATION

East Bay is a small inlet that provides access to the larger Centerville Harbor, which in turn opens on Nantucket Sound south of the town of Barnstable. The applicants own a lot — a slim strip — of marshy land between East Bay Road (running parallel to the shore of the inlet) and the intertidal zone. The lot serves only to give access to the water.

The applicants have available for recreational use their kayaks, windsurfers, a dinghy, a "Boston Whaler," and a "Regulator." All but the latter two are small enough to be launched from the shore; the two larger craft would presumably be reached by a kayak or the dinghy or perhaps a rowboat happening to be on hand.

With a purpose to obtain dry-foot pedestrian access particularly to the larger vessels, the applicants requested the commission's permission (technically an "order of conditions") to

---

[2]This is a consolidated appeal. The commission dismissed the original application without prejudice when an amendment was too tardily filed; the applicants, out of abundant caution, attacked the dismissal by certiorari to the Superior Court, see G. L. c. 249, § 4. After renewed application, hearing by the commission, and decision on the merits against them, the applicants again invoked certiorari. On motion in each case for judgment on the pleadings, a judge of the Superior Court (considering only the administrative record) held for the applicants. The commission's appeals to this court were consolidated for hearing and disposition.

erect a structure commencing at the seaside edge of East Bay Road and extending into the bay. From roadside to terminus, it would consist serially of a boat rack, timber boardwalk, timber pier fixed on wood piles, ramp, and floats. The structure would have a length of 162 feet. This considerable length is explained by the water depth. Under most of the fixed pier it would be less than one foot at low tide, and under the floats' end barely two feet at low tide.[3]

The commission's "Regulations for Private Piers and Docks" (regulations) under the title "Piers, Docks and Floats," states in § D.1:

> "D. No project footprint (including pier, dock, floats or dolphins) shall extend further offshore than:
>
> 1. A point equaling ½ of the lot's water frontage, measured at MHW [mean high water] to prevent crowding, except that owners of two adjoining lots may combine frontage and erect a shared pier."[4]

The applicants' lot has about 108 feet of water frontage. By common understanding, the proposed structure would exceed the allowed length into the water by not less than fifty feet.[5] The judge of the Superior Court indicated that in his view there was

---

[3] Thus it is not feasible to achieve compliance by shortening the structure; that would leave insufficient clearance for docking, see *infra*. The judge of the Superior Court suggested the possibility of allowing permission for the structure with conditions, but he did not propose any. Nor have the applicants proposed any.

[4] The authority of the commission to issue these regulations is explained in the leading case of *Fafard* v. *Conservation Commn. of Barnstable*, 432 Mass. 194 (2000). See *Lovequist* v. *Conservation Commn. of Dennis*, 379 Mass. 7 (1979). Under the Home Rule Amendment (art. 89, § 6, of the Amendments to the Massachusetts Constitution), a town such as Barnstable is empowered to enact a wetlands protection bylaw that is more restrictive or stringent in its local application than the State Wetlands Protection Act, G. L. c. 131, § 40, and Barnstable has done so in chapter III, art. XXVII, of the Barnstable General Ordinances. The Barnstable commission's regulations carry out certain purposes of the bylaw, including "recreation," a "wetland value."

[5] Widths would be: boardwalk, four feet; pier, four feet; ramp, three feet; floats, eight feet. No width is given for the boat deck; it would be adjacent to the boardwalk or pier. The surface area of the structure would measure about 752 square feet, with the surface area of the inlet being about 720 acres.

no excess, but he seems to have been thinking of the end point of the fixed pier, and ignoring the attached ramp and floats.

The applicants, having the burden of proof to show the structure "will not harm interests protected by the by-law," *FIC Homes of Blackstone, Inc.* v. *Conservation Commn. of Blackstone*, 41 Mass. App. Ct. 681, 685 (1996), do not deny they have failed to demonstrate compliance with § D.1, and the commission has made findings against them (i) of their failure to make out such a case, and (ii) of their violation of § D.1 in their intended structure.

Without contesting the violation, the applicants have urged the commission to exercise discretion[6] and waive compliance. This involves a match-up of the likely improvement of the convenience of the applicant to be brought about by the new structure, with any loss to the public interest that would be caused thereby.

As to the convenience of the applicants, the fourteen foot Boston Whaler, with outboard motor down, could dock at floats' end, as it would displace but one foot of water. The twenty-six foot Regulator, with outboard motor down, reaches thirty-one inches into the water and thus would scrape the bottom in attempting to dock at low tide when, as noted, the depth of water is barely two feet. It would not be prudent to expect always to come in with the Regulator at high tide (the condition at high tide is not made clear).[7] (The Whaler and Regulator would berth in the nearby mooring area or elsewhere.)

In respect to the public interest, particularly regarding recreation, the applicants espoused the position at the hearing before the commission that the conditions at and around the

---

[6]The applicants cite the closing paragraph of the regulations: "These regulations notwithstanding, the Conservation Commission will consider any and all pier proposals on a site specific basis, disposing of each according to its merit and the degree to which statutory interests have been protected and preserved at the locus."

[7]As to the question of clearance, the Commission's regulation § E warns as follows: "Within the limits of the performance standards governing overall length, proposed piers shall also attain adequate depth such that the depth of any berth (to existing bottom; based on MLW [mean low water]) minus the boat draft equals or exceeds one foot. This provision is for the purpose of preventing bottom scouring and attendant impacts to fisheries, shellfish infauna and water quality."

locus were already poor and the installation and employment of the proposed structure would not worsen these conditions.

The mooring area referred to, now covering twenty-three acres, is already quite busy, and the number of moorings is increasing yearly at a high rate. If the new structure were built, it would neighbor upon the mooring area and likely narrow the space for movement of craft in between. More generally, the structure from shore to floats' end, including the pier fixed to the ground, would interfere with small boat recreational movement and passage. Although it was debated at the hearing how much windsurfing was then actually taking place about the locus, it can be seen that the emplacement of the structure would act as a damper and physical hindrance to the future of the sport in this area of the inlet.

The applicants point to an outhaul consisting, as the record allows us to conceive it, of a post in the water and some terminus on or near the shore, with a line running between. It is used hand over hand, as it were, to assist small craft operators to get from shore into deeper water more or less dry-foot. The outhaul lies a short distance from, and alongside, the putative structure. The applicants argue the outhaul is already an obstruction. The commission found expressly that the length of the outhaul is short of the length of the proposed structure; besides, that structure in its heft and fixed character would surely aggravate the outhaul line as an obstruction. (Incidentally, the applicants could not furnish information whether the outhaul required or had secured some official approval or was, indeed, illegal and subject to removal.)

*Comment.* With violation of regulation § D.1 conceded, and the facts pretty clear, the commission, fully familiar with local conditions, had also before it the views of two experts on the part of the applicants, matters brought out through interrogation of the experts by commission members, and some help from commission staff. In the match-up suggested above, it is all too easy to exaggerate the advantage in convenience to the applicants from the proposed construction, and to underestimate the resulting public detriment. At any rate the Superior Court judge may be faulted in the present case for failing to give due weight to the overall judgment of the commission. In order to

overturn that judgment here, the applicants must establish that it was arbitrary and capricious or unsupported by substantial evidence. See *Lovequist* v. *Conservation Commn. of Dennis*, 379 Mass. 7, 18 1979); *FIC Homes of Blackstone, Inc.* v. *Conservation Commn. of Blackstone*, 41 Mass. App. Ct. at 684-685 & n.4. They have not made out the case.[8] Our court has referred recently to the respect owed by a court to a conservation commission's decision, and said that where (as here), "in the discretionary exercise of its expertise," an agency has made "a 'choice between two fairly conflicting views,' and its selection reflects reasonable evidence, '[a] court may not displace [the agency's] choice.' " *Conservation Commn. of Falmouth* v. *Pacheco*, 49 Mass. App. Ct. 737, 739 n.3 (2000) (quoting ultimately from *Southern Worcester County Regional Vocational Sch. Dist.* v. *Labor Relations Commn.*, 386 Mass. 414, 420 [1982]).[9]

## ISSUE REGARDING CONTIGUITY

Section C of the commission's regulations provides:

> "Private, non-commercial piers and docks, being structures accessory to and appurtenant to dwellings, will be permitted only on land contiguous to the dwelling served, except where unusual circumstances of long standing may apply."

The applicants concede they cannot show compliance with the contiguity requirement: their dwelling, apparently on the

---

[8]The applicants in their brief also argue in effect that the commission was not dealing truly with their individual application on the merits but was just carrying out a plan and campaign against all intrusion of private piers. Such a charge is more easily made than proved. Indeed, the applicants themselves complain that the commission discriminates by approving construction of piers in other locations within its jurisdiction — which indicates the commission at least has no universal opposition to new piers.

[9]In another context, Chief Justice Qua put the point perhaps even more favorably for the agency when he said: "[T]he court should be slow to decide that a public board has acted unreasonably or arbitrarily. The court should cast about to discover, if possible, some ground which reasonable men might deem proper on which the action can rest." *Cotter* v. *Chelsea*, 329 Mass. 314, 318 (1952). See Hackney & Barnard, Bogged Down in Wetlands Appeals: Proposal for Reform, Boston Bar J. 6, 18-19 (Nov./Dec. 2001).

upland side of East Bay Road, is not contiguous with their seaside lot or land on which the proposed structure would lie. The commission noted the failure to satisfy § C and made it an alternative ground for denying the application.[10]

Section C allows an escape from the contiguity provision where "unusual circumstances of long standing" are shown to exist and in this sense this regulation may serve more or less as a "grandfathering" clause. The difficulty here is with the facts. What has previously existed has not been a pier but, as the commission found, an open rack for small boats. There is no solid evidence of record about any "unusual circumstances" or about the period of time during which the alleged circumstances prevailed. If, perchance, the "except" language of § C does not occupy the field, and some room is still left for more general discretion, then firm data have not been furnished for its exercise.

On the record, it appears that the commission was right to accept the noncompliance with § C as a basis of decision. But little attention was paid to the matter by the commission or the judge below. Accordingly, if the recreation ground of our decision fails upon possible review, it would seem desirable for the applicants to have leave to apply to the Superior Court for an order that would direct the commission to reconsider and take further proof on the subject of § C.

## CONCLUSION

The judgments of the Superior Court herein are vacated. A judgment shall enter in the Superior Court upholding so much of the ruling of the Barnstable Conservation Commission as denies the application on "recreational" grounds. This court

---

[10]In their application to the commission, the applicants wrote about the "site" as "appurtenant" to a "nearby house lot" and again about a 1969 subdivision of an estate with several dwellings and a narrow frontage parcel on the bay. The applicants' (seasonal?) dwelling house seems separated by a number of dwellings (and the road) from the 108 foot lot. These references were not discussed at the hearing. The Superior Court judge merely repeated words of "appurtenance." Incidentally, the record contains a copy of an application to the Barnstable zoning board of appeals for a variance to accommodate the proposed construction.

takes no action with respect to the commission's ruling so far as it rests on "contiguity" grounds.

*So ordered.*