Nickerson, Gary A., J.
Plaintiffs David and Teresa Franchi filed this action in response to the Falmouth Conservation Commission’s issuance of an Order of Conditions for the construction of a replacement dock on their property. They seek certiorari review and declaratory relief from the Falmouth Conservation Commission’s decision to impose certain conditions on the construction of the dock. Plaintiffs’ motion for judgment on the pleadings was heard April 26, 2007.

BACKGROUND

The plaintiffs own residential property at 48 Deer Run Lane, North Falmouth, Massachusetts (“the Property”). On or about November 10, 2005, the plaintiffs filed a notice of intent seeking approval to replace an existing dock on the Property. The Property lies along a canal, which feeds into Fiddler’s Cove in Falmouth, Massachusetts.
A dock has existed at the Property since approximately 1987. The Massachusetts Department of Environment Protection (“the DEP”) granted a dock permit to a previous owner on June 30, 1987. The Falmouth Conservation Commission (“the Commission”) issued a Certificate of Compliance for the dock on October 28, 2004, which was recorded. As the dock currently exists, it consists of a ramp of about 20 feet that terminates at a 6 by 24-foot float. The plaintiffs first sought to replace the existing float and ramp with a 4 by 26-foot ramp, a 6 by 24-foot float, two 12-inch diameter piles, and three 12-inch dolphin piles.
Mark Patton, Director of the Town of Falmouth Department of Natural Resources, conducted a site visit. Patton concluded that the plaintiffs’ project should be considered “new construction” and not a “reconstruction.” He told the Commission that “[t]he proposed configuration occupies very little of the original footprint of the current structure" and “it has long been the position of the Conservation Commission that such projects should fall under all regulation and policies that appertain to a new structure.”
During his visit, Patton had a shell fisherman perform a half-pull of the area around the dock with a 24-inch non-screened bull rake. This half-pull revealed a total of thirty shellfish. Patton suggested that the Commission therefore require a shellfish survey to be done on the site. Correspondence from the Massachusetts Division of Marine Fisheries (“the DMF”) noted that Fiddler’s Cove was “Conditionally Approved” to be open for shellfishing between November 1 and April 30. Patton stated that the area is actively shellfished during the winter months.
Paul J. Diodati of the DMF voiced concerns about the project to the Commission in a letter dated December 14, 2005. Diodati stated that the project was within a “mapped habitat” for oysters and quahogs, effectively rebutting the fact that Fiddler’s Cove is not included on the Town of Falmouth’s Natural Resources Map as an area significant to shellfish. Regarding the dock’s design, Diodati stated that there was a danger that the proposed float would cause depressions in the substrate. While the water depth at the float was 3.5 feet, the pier profile showed that the water depth from the bottom of the boat to the substrate was about 2 feet. Further, DMF was concerned that motorized vessels using the float would most likely have less than 2 feet of separation from the bottom of the propeller and the substrate, and consequently “may result in the ‘prop dredging’ of the substrate."
Later, Vaccaro Environmental Consulting, Inc. (“VEC”) conducted a shellfish survey on the site leading to a Shellfish Survey Report dated January 19, 2006. The survey found that the recorded species density for quahog exceeds the threshold value of one quahog per 9 square feet established for significance under the Town of Falmouth Wetlands Regulations (“FWR”) 10.16(3). The species density for oysters was below the threshold value of three oysters per 9 square feet established in the same regulation. Relying on the quahog density, and the status of the canal as seasonally open to shellfishing, VEC determined that the site was “significant to shellfish as defined under the Falmouth Wetlands Regulations.”
After an initial hearing, the plaintiffs modified their proposal to include an “L” shaped fixed dock in place of the ramp and float, averting the danger that the float might interfere with the substrate. The plaintiffs also submitted a variance request to the Commission for relief from FWR 10.16(l)(h)(2), which prohibits construction of a new dock under certain situations, and from FWR 10.16(l)(d)(3), which limits the square footage of docks.
On March 22, 2006, the Commission approved the plaintiffs’ variance request, and issued an Order of Conditions approving construction of the fixed dock. *369 The Order of Conditions listed six specific findings by the Commission. First, the Commission found that the area around the replacement dock exceeded the shellfish density requirements of FWR 10.34(3)(b)(l). Second, it found that there was an existing licensed dock on the Property which was previously approved by the Commission. Third, it found that the “proposed replacement dock has a footprint that is slightly different than the existing dock, but it is identical in size.” Fourth, it found that the plaintiffs’ plan depicted a 50-foot mooring field, and that using a fixed dock rather than a float would better protect resource areas. Fifth, it found that the DMF noted that the maximum water depth at low tide would be about 4 feet and “large motorized vessels with drafts over 2 feet may still have less than 2 feet of separation between the bottom of the propeller skeg and the substrate.” Thus, use of the dock by such vessels may result in “prop dredging” the substrate, adversely impacting the significant shellfish habitat. Last, the Commission noted that the plaintiffs offered mitigation “for excess shellfish density of $1,000.00 worth of shellfish spat.”
There are six special conditions in the Order of Conditions. Special conditions four, five, and six are at issue. Special condition four is that “[a] boat draft restriction of 24 inches shaíl be imposed in the area of the dock designated as the mooring field.” Special Condition five is that “[o]nly one vessel may be tied to the pier at any given time.” Special Condition six provides that the Order of Conditions expires in three years, and may be renewed for periods of five years so long as an agent of the Commission determines that the dock is not adversely impacting the site.[2] Three standard conditions in the Order of Conditions, numbered 32, 33, and 34, impose maintenance burdens similar to that of special condition six.
In the plaintiffs’ complaint, they challenge the Commission’s findings and imposition of special conditions four, five, and six. In argument before this court, the plaintiffs clarified their position to include a challenge to the standard conditions numbered 32, 33 and 34. The fate of conditions 32, 33 and 34 is directly tied to that of special condition six and requires no separate consideration.

DISCUSSION

A. Standard of Review

General Laws c. 249, §4, establishes limited judicial review in the nature of certiorari “to correct errors in proceedings which are not according to the course of the common law . . . [and] not otherwise renewable.” Sheriff of Plymouth County v. Plymouth County Pers. Bd., 440 Mass. 708, 710 (2004). “Certiorari allows a court to ‘correct only a substantial error of law, evidenced by the record, which adversely affects a material right of the plaintiff.’ ” Id., quoting Massachusetts Bay Transp. Auth v. Auditor of the Commonwealth 430 Mass. 783, 790 (2000).
An arbitrary and capricious standard of review is applied when reviewing a conservation commission’s discretion to impose conditions for the protection of wetlands. T.D.J. Dev. Corp. v. Conservation Comm’n of North Andover, 36 Mass.App.Ct. 124, 128 (1994), citing Forsyth Sch. for Dental Hygienists v. Board of Reg. in Dentistry, 404 Mass. 211, 217 & n.2 (1989). A decision is not arbitrary or capricious unless “there is no ground which ‘reasonable [persons] might deem proper’ to support it.” FIC Homes of Blackstone, Inc. v. Conservation Comm’n of Blacks tone, 41 Mass.App.Ct. 681, 685 (1996), quoting T.D.J. Dev. Corp., 36 Mass.App.Ct. at 128. This standard of review recognizes that it is a court’s duty to “give due weight to the overall judgment of the commission.” Dubuque v. Conservation Comm’n of Barnstable, 58 Mass.App.Ct. 824, 828 (2003).
When a decision is based on factual findings, the court may consider the evidentiary basis for those findings because a decision based on facts not supported by substantial evidence is arbitrary and capricious. See Doherty v. Retirement Bd. of Medford, 425 Mass. 130, 135 (1997). Substantial evidence is “such evidence as a reasonable mind might accept as adequate to support a conclusion.” Id. In considering whether substantial evidence supports the facts found, the court must examine the entire record and take into account whatever fairly detracts from the weight of the conclusion reached. Id. at 131. A court owes a conservation commission respect “ ‘in the discretionary exercise of its expertise’ . . . [and] may not displace [it’s] choice” where the evidence is conflicting. Dubuque, 58 Mass.App.Ct. at 829, quoting Conservation Comm’n of Falmouth v. Pacheco, 49 Mass.App.Ct. 737, 739 n.3 (2000). Nevertheless, a conservation commission “cannot rely on this expertise as a substitute for substantial evidence to support its decisions.” See Cobble v. Commissioner of the Dep’t of Soc. Servs., 430 Mass. 385, 394-95 (1999) (discussing deference to agency decisions).

B. The Commission’s Findings

There is substantial evidence in the record to support all of the Commission’s material findings. The record reveals that the area around the replacement dock exceeds the density requirements for shellfish set forth in FWR 10.34(3)(b)(l). VEC’s shellfish survey revealed that the recorded species density for quahogs at the site exceeds the threshold value of 1 quahog per 9 square feet. The parties do not dispute this survey’s validity. In addition, the site is approved for shellfish-ing and DMF mapping classifies the area as a shellfish habitat. Consequently, there was substantial evidence to find that there was a significant amount of shellfish at the site despite that Fiddler’s Cove is not included as a shellfish rich area on the Town of Falmouth’s Natural Resources Map.
There is also substantial evidence to support the Commission’s finding that the proposed dock’s foot *370 print is different from the current dock. As it currently exists, the dock consists of a ramp of about 20 feet that terminates with a 6 by 24-foot float. The plaintiffs’ final proposal was to replace the existing float and ramp with an “L” shaped timber dock running some 26 feet from shore and running 24 feet parallel to the shore, and three 12-inch dolphin piles. The Commission seeks to prevent danger to the significant shellfish resources below. This concern remains regardless of whether the docks are identical in size, similar, or wholly different.
C. Special Conditions Four, Five, and Six.
There is substantial evidence to support the Commission’s decision to impose special conditions four, five, and six in the Order of Conditions. The Commission was entitled to limit the size and number of vessels that may be docked because the record indicates that there will otherwise likely be damage to the surrounding shellfish bed. The Commission was empowered to impose continuing requirements that the proposed dock not alter protected wetlands.
Special Conditions four and five require that “[a] boat draft restriction of 24 inches shall be imposed in the area of the dock designated as the mooring field” and that “[o]nly one vessel may be tied to the pier at any given time.” Substantial evidence in the record indicates that boats with larger drafts could damage the site. The DMF stated that the maximum water depth was approximately 4 feet at low tide, and that large motorized vessels with drafts over 2 feet may still have less than 2 feet of separation between the bottom of the propeller and the substrate. This could result in “prop dredging” adversely impacting significant shellfish habitat. Such danger remains despite the elimination of the float as a source of damage to the substrate. Limiting the size and number of vessels that may be docked and cause damage to the substrate are measures that are merited by the record.
In addition, the plaintiffs argue that special condition six is invalid because it allegedly calls for arbitrary future review of the Order of Conditions. This provision requires the Commission to conduct a site visit three years after issuance to determine if the dock is causing an adverse impact or alteration to the resource areas on the Property. If there are adverse impacts and alterations, there will be a hearing, and the plaintiffs must take corrective action within one year. If there is no impact or alteration, then a renewal permit will be granted for five years. The Commission apparently imposed this condition in accordance with FWR 10.16(l)(j), which allows such a permit scheme.
The Commission’s decision to impose the monitoring condition set forth in special condition six is not arbitrary or capricious unless “there is no ground which ‘reasonable [persons] might deem proper’ to support it.” See FIC Homes of Blackstone, Inc., 41 Mass.App.Ct. at 685 (1996), quoting T.D.J. Dev. Corp., 36 Mass.App.Ct. at 128. It is not beyond a conservation commission’s authority to prevent applicants from altering a coastal resource unless they continue to meet certain conditions. The Commission’s authority under the bylaw to impose conditions on construction of a dock that impacts and alters wetlands mirrors the WPA. G.L.c. 131, §40. The WPA prohibits construction and alterations to protected wetlands absent permission from a conservation commission. Id. It authorizes such commissions to require that an applicant’s work is done in accordance with an order of conditions. Id. Conservation commissions are further charged with issuing certificates of compliance to verify that work has complied with the order of conditions. Id. Conservation commissions are entitled to impose continuing maintenance requirements upon applicants, and require removal of alterations to wetlands if they do not comply. See Id.; 310 Code Mass. Regs. §10.05(9)(e) (“If the final order contains conditions which continue past the completion of the work, such as maintenance or monitoring, the Certificate of Compliance shall specify which, if any, of such conditions shall continue”). An applicant may not alter wetlands absent this permission. Consequently, if an applicant does not continue to meet the requirements set forth in an order of conditions and verified in a certificate of compliance, they have no authority to continue to alter wetlands.
The Commission’s decision in this case to impose special condition six is merited by the substantial evidence in the record that unfettered use of the dock will likely result in damage to the substrate. The plaintiffs only articulated challenge to special condition six is that it allows for arbitrary review of whether the dock has adversely impacted the site. On its face, however, the condition does not purport to authorize such review. If the Commission later fails to put forth a reasonable basis for subsequent decisions regarding the impact of the dock, the plaintiffs may challenge such decisions in due course. This Court does not pass on the appropriateness of imposing such conditions through perpetual renewal of an order of conditions instead of a certificate of compliance, as this issue was not raised by the parties. See 310 Code Mass. Regs. § 10.05(9) (e).
Finally, the plaintiffs argue that special conditions four, five, and six are not appropriate because the Commission erred in deciding that the dock was a “new dock” pursuant to FWR 10.16(l)(h)(2), and not a reconstruction.[3] The finding that the replacement dock was a “new dock” was well within the Commission’s authority to interpret its regulations. Moreover, the act of placing pilings in the subsurface where none have ever been is by common understanding of our language the creation of a new dock. Regardless of whether the dock is a “new dock,” the Commission has inherent power from the WPA and the Falmouth Wetlands By-Law to impose conditions to protect the surrounding wetlands from adverse alteration. The Falmouth Wetland Regulations fully artic *371 ulate the concern that construction, maintenance, and use of any dock may have adverse effects on protected areas. See FWR 10.16(1). The Commission’s decision to impose the three contested special conditions is based on there being significant shellfish density and a concern for “prop dredging.” These concerns remain regardless of whether a dock is a “new dock”; they are not based on a violation of FWR 10.16(1) (h) (2).
The Court need not pass on the appropriateness of the variance.

ORDER

For the foregoing reasons, it is ORDERED that the plaintiffs’ motion for judgment on the pleadings be DENIED. It is ORDERED that judgment enter for the Defendant AFFIRMING the Order of Conditions.

SpeciaI condition six provides as follows:
This permit will be issued for a period of three (3) years. At that time the Conservation Administrator or Agent will conduct a site visit to determine if there is an adverse impact or alteration to the resource areas on the property. If any impact or alteration has been identified the applicant or property owner will be notified and a hearing will be scheduled. These impacts or alterations shall be corrected within one year. If it is determined that no impact or alteration has occurred then a renewal permit will be granted for five (5) years.

Falmouth Wetland Regulation 10.16(l)(hK2) provides as follows:
No new dock or pier shall be allowed if, within 35 feet of the area designated by the applicant as the mooring field, there are significant quantities of shellfish as defined by FWR 10.34(3) and the area has been historically used for shellfishing or has potential for shellfishing, and the sediment provides a viable shellfish habitat.