Nickerson, Gary A., J.
INTRODUCTION
The plaintiff, Great Harbors Resident Association, is seeking judicial review, pursuant to G.L.c. 249, §4, of a decision by the defendant, the Falmouth Conservation Commission, denying an order of conditions for the expansion of a dock system. After the filing of the administrative record, Great Harbors moved for judgment on the pleadings pursuant to Mass.R.Civ.P. 12(c) and the Commission opposed. The court heard the matter on February 19, 2008.
BACKGROUND
The following facts are taken from the administrative record. On July 12, 2006, Great Harbors filed a Notice of Intent to expand its dock system by adding twenty slips to each of two docks. Great Harbors filed a separate application for a variance from several of the Falmouth Wetlands Regulations. In its NOI, Great Harbors explained that it wished to expand the number of slips because the current docking system could no longer support its members’ demands for boating activities.
There are approximately 380 residents at Great Harbors and more than sixty are on a waiting list for the slips owned by Great Harbors situated on Great Pond. Of those on the waiting list, approximately thirty to forty use moorings on Great Pond to access their boats. There are 490 moorings on Great Pond, forty more than the 450 limit. While all Great Harbor residents pay $170 annually for the maintenance and use of the association’s recreational facilities, residents pay an additional $1,200 per year for a slip.
Great Harbors constructed its pier in the 1960s prior to Falmouth adopting its wetlands bylaw in 1979. The proposal involves the docks extending from lot 405 and lot 414. The dock at lot 405 includes twelve slips dedicated to Great Harbors owners and extends perpendicular from the shoreline 156 feet from the mean high water. The dock at lot 414, an L-shaped dock, includes thirty-two owner dedicated slips and extends perpendicular from the shoreline 251 feet from the landward edge of the salt marsh and 186 feet from the mean high water. Even prior to the proposed expansion, neither lot complied with the 100-foot limitation imposed on recreational harbors, community docks, and common docks.[1] Further, the lots failed to comply with the area regulations pertaining to an “L” or “T" shaped dock for both recreational harbors and community docks.[2] The regulations do not impose size or area limitations upon docks in commercial harbors. The regulations, however, define neither commercial nor recreational harbors.[3] A final regulation limits the ability to place a dock in a FEMA designated velocity zone absent the applicant showing a public benefit from the project.[4]
Great Harbors applied for a variance from FWR 10.16(l)(f)(l) and FWR 10.16(l)(f)(3) governing community docks and, in the alternative and under protest, a variance from FWR 10.16(l)(h)(l) governing velocity zones. Great Harbors noted in its application that the project does not sit within a FEMA designated velocity zone thereby precluding the application of FWR 10.16(l)(h)(l). The regulations define velocity zones as “those portions of land subject to coastal storm flowage which are coastal high hazard areas or areas of special flood hazard extending from the inland limit within the one-hundred-year flood plain seaward supporting waves greater than three (3) feet in height.” FWR 10.38 (2) (a) (2).
The regulations set forth the procedures governing requests for variances. FWR 10.13 provides in part:
(1) Any individual who suffers a Hardship as defined in these regulations may petition for a variance from Chapter 235 and these regulations provided:
(a) The project does not meet one or more of the performance standards articulated in FWR 10.16 through 10.60; and
(b) Mitigating measures are proposed by the Applicant that will allow the project to be conditioned so as to contribute to the protection of the Resource areas identified in Chapter 235; and
(c) The project will not create a nuisance; and
(d) The hardship was not created by the applicant or the applicant’s agents; and
(e) the resource area delineated in Chapter 235 will be better protected if the project is allowed than if the project is denied, or the project has overriding public benefit.
*611 The regulations define hardship as arising when applying the regulations would “involve substantial economic loss to the Applicant” and further that “[n]o Hardship exists where there is established under the Code of Falmouth a right to transfer development rights.” FWR 10.04.
The Commission conducted three hearings and the transcripts from those hearings are part of the record. The first hearing on August 23, 2006 focused upon the importance of Great Harbors including a pumpout station as a public benefit to offset the immense scope of the variance request. Great Harbors cited another public benefit as arising by the removal of thirty to forty boats off of the moorings on Great Pond should the residents have access to additional slips. The meeting concluded with the understanding that Great Harbors would return for a further discussion regarding the possibility of a pumpout station to satisfy the public benefit requirement.
The next meeting took place on September 20,2006 and began with a description of Great Harbors’ proposal of a portable pumpout station on a wheeled cart. The Commission then noted the requirement that Great Harbors demonstrate not only a public benefit but also a hardship and an improvement to the resource area. The focus of the Commission turned to the hardship criteria. Great Harbors argued that failing to permit certain members of Great Harbors to use the docks amounted to a substantial economic hardship. The meeting then shifted back to the pumpout station and concluded with Great Harbors promising to provide more detailed plans regarding the pumpout station.
The final hearing took place on October 4, 2006 and once again focused upon the hardship criteria. There was considerable disagreement among the members of the Commission whether there was an economic hardship. Some members of the Commission agreed that the impact on the elderly traveling out to the moorings amounted to a hardship. Additionally, during this meeting there was a lengthy discussion regarding the difficulty of classifying the dock system as commercial, community, or common because Great Harbors did not easily fall within a classification. There was a general sense of disagreement among the Commission regarding how to classify the dock systems. Further, in order to assure the reduction in the number of boats on Great Pond, the Commission suggested that Great Harbors residents living on the waterfront surrender their waterfront property rights to individual docks. As a compromise, Great Harbors proposed that it would bump those waterfront owners on the waiting list for a slip to the front of the list.
On October 18, 2006, in a close vote, the Commission denied the project and made 54 findings.[5] The record includes a backup draft approving the project with slightly different findings which the Commission never disclosed prior to the vote. In its denial, the Commission found that Great Pond was a recreational harbor because it had no commercial boating activities along its shoreline thereby precluding its classification as a commercial harbor or commercial dock. Further, the Commission found that the project did not involve a community dock because neither the existing docks nor the proposed docks were limited to dinghies as specified in FWR 10.04. The Commission went on to find that adding forfy slips to the existing forty-four slips and 490 moorings would represent a 7.5 percent increase in the number of boats on Great Pond and that there would be an adverse impact to resource values.
Next, the Commission found that Great Harbors did not satisfy the hardship criteria based upon Great Harbors residents not having immediate access to a boat slip because that did not amount to an economic loss. Further, the Commission found that Great Harbors failed to demonstrate how the resource areas would be better protected if the Commission approved the project as opposed to the Commission denying the project. The Commission further found that there was not a sufficient overriding public benefit and that Great Harbors failed to establish that the increased number of boats would not create a nuisance on Great Pond. Finally, the Commission noted that the new Great Harbors policies regarding the wait list would not guarantee a permanent reduction in the number of docks on Great Pond.
DISCUSSION
Superior Court review of an agency decision in the nature of certiorari is limited to correcting substantial errors of law, apparent on the record which adversely affect material rights. G.L.c. 249, §4; Carney v. Springfield, 403 Mass. 604, 605 (1995) (“A court will correct only a substantial error of law, evidenced by the record, which adversely affects a material right of the plaintiff’). In its review, the Superior Court “may rectify only those errors of law ‘which have resulted in manifest injustice to the plaintiff or which have adversely affected the real interests of the general public.’ ” Carney, 403 Mass. at 605, quoting Murray v. Second Dist. Court of E. Middlesex, 389 Mass. 508, 511 (1983). In a certiorari action, the reviewing court may apply either the “substantial evidence” or the “arbitrary and capricious” standard. Lovequist v. Conservation Comm’n of Dennis, 379 Mass. 7, 17-19 (1979). Under either standard, the plaintiff must demonstrate that the Commission’s decision caused substantial injury or manifest injustice. North Shore Corp. v. Board of Selectmen of Topsfield, 322 Mass. 413, 418 (1948).
The nature of the action in question determines the standard of review. Forsyth Sch. for Dental Hygienists v. Board of Registration in Dentistry, 404 Mass. 211, 217 (1989). If the plaintiff alleges that the administrative agency issued its decision contrary to the evidence appearing in the administrative record, this court applies the substantial evidence test. New Boston *612 Garden Corp. v. Board of Assessors of Boston, 383 Mass. 456, 466-67 (1981). “Substantial evidence” is “such evidence as a reasonable mind might accept as adequate to support a conclusion.” Id. at 466. When a plaintiff claims that an agency abused its discretion when making its decision, the court will apply the “arbitrary and capricious” standard. T.D.J. Dev. Corp. v. Conservation Comm’n of North Andover, 36 Mass.App.Ct. 124, 128 (1994). A commission’s decision will satisfy the “arbitrary and capricious” standard “unless there is no ground which ‘reasonable men might deem proper’ to support it.” Id., quoting Cotter v. Chelsea, 329 Mass. 314, 318 (1952). If the agency acted for reasons extraneous to the prescription of the governing regulatory scheme, and, instead for reasons related to an ad hoc agenda, then the agency acted arbitrarily, because the basis for action is not uniform, and therefore unpredictable. Fafard v. Conservation Comm’n of Reading, 41 Mass.App.Ct. 565, 568 (1996).
Great Harbors appears to be making two arguments. First, it argues that the Commission arbitrarily and capriciously ignored the fact that it could have reviewed the project without requiring any variances. Specifically, Great Harbors argues that the proj ect was within a commercial harbor and not a recreational harbor. As an initial matter, it is worth noting that Great Harbors never suggested in its application a belief that the project fell outside the scope of a variance request. This is evidenced by the fact that Great Harbors went through the trouble of applying for a variance from FWR 10.16(1)(h)(1) governing velocity zones under protest. Nonetheless, where the Commission is choosing between two competing views, the court will not displace the Commission’s choice if the Commission made that choice in accordance with reasonable evidence. Dubuque v. Conservation Comm’n of Barnstable, 58 Mass.App.Ct. 824, 829 (2003).
The Commission held a lengthy discussion during the October hearing regarding the classification of Great Pond. In classifying Great Pond as a recreational harbor and not a commercial harbor, the Commission noted that there are no commercial activities along the shoreline such as gasoline, ice, and pump-out facilities thereby precluding its classification as a commercial harbor. Further, the Commission considered other commercial harbors and differentiated them from Great Pond based upon their heavy usage. These considerations were neither extraneous nor arbitrary. The regulations effectively precluded the Commission from finding that the proposed project was either a community or common dock. The Commission was left with finding that Great Pond was either a commercial or recreational harbor. Given these two competing views, the court will not displace the decision of the Commission in a close vote that Great Pond is a recreational harbor.
The second argument pertains to the denial of the variance request itself. Great Harbors argues that the Commission acted arbitrarily and capriciously in denying the variance and applying FWR 10.13. Falmouth has adopted specific procedures governing variances from its wetlands regulations. Applicants have no legal right to a variance. Pierce v. Conservation Comm’n of Falmouth, 63 Mass.App.Ct. 1114, at *3 (2005) (Rule 1:28 decision), citing Board of Appeals of Barnstable, 331 Mass. 555, 557, 559 (1954); FIC Homes of Blackstone, Inc. v. Conservation Comm’n of Blackstone, 41 Mass.App.Ct. 681, 686 (1996). Further, the applicant bears the burden of proof of each and every element for a variance and variances from the Falmouth Wetlands Regulations are “intended to be employed only in rare and unusual cases.” FWR 10.03; Carrioulo v. Falmouth Conservation Comm’n, No. 2004-231-A, 2006 Mass.Super. LEXIS 122, at *12 (Kane, J.) (2006) (quoting commentary to FWR 10.13). The Commission is better suited than the court to analyze the special circumstances presented by the applicants in granting a variance. Pendergast v. Board of Appeals of Barnstable, 331 Mass. 555, 557-58 (1954).
Here, even prior to reaching subsections FWR 10.13(l)(a) through FWR 10.13(l)(e), Great Harbors must establish that it suffered a legal hardship in accordance with FWR 10.04 and more specifically, that it suffered a substantial economic loss.[6] The Commission held extensive debates regarding whether or not the inability of those members paying $170 in membership fees to have access to a slip amounted to a hardship. Reasonable men might deem it proper to support the position that there was no hardship within the meaning of FWR 10.04 based upon the fact that members had to pay an additional $1,200 for a slip. There are over sixty residents on a waiting list for a slip and the proposal was for only forty additional slips. Therefore, the Commission’s finding that Great Harbors failed to establish a hardship was not arbitrary or capricious.
Great Harbors makes two additional arguments apart from the denial of the variance. First, Great Harbors seems to argue that the variance procedures are impossible to satisfy. As mentioned supra, applicants have no legal right to a variance. Further, “(n]o statute or by-law requires the commission to even provide a procedure for obtaining variances from the provisions of its wetlands by-law.” Pierce, 63 Mass.App.Ct. at *3. Therefore, Great Harbors’ argument fails as to the difficulty of the variance procedures. Second, Great Harbors argues that the preparation of an alternative draft approval with different findings indicated that the findings in the denial were concocted and therefore arbitrary and capricious. This argument fails because by the very nature of a vote, certain members of the Commission may disagree with the findings. This does not transform those findings into being arbitrary and capricious.
*613 ORDER
For the above stated reasons it is ORDERED that Great Harbors’ motion for judgment on the pleadings be DENIED and that the decision of the Falmouth Conservation Commission denying the plaintiffs request to expand its piers be AFFIRMED.

FWR 10.16(l)(d)(l) pertaining to Recreational Harbors, 10.16(l)(f)(l) pertaining to Community Docks, and 10.16(l)(g)(l) pertaining to Common Docks provide in part that “[djocks shall not exceed the following: over 100 feet in length beyond mean high tide, or 100 feet in length beyond the landward edge of salt marsh.”

FWR 10.16(l)[d)(3) pertaining to Recreational Harbors and 10.16(lKf)(3) pertaining to Community Docks provide that “[t]he area of the terminal ‘L’ or T shape in a fixed dock, or the float, or combination thereon shall not exceed 100 square feet.” There is no area limitation imposed on common docks.

The regulations do define a community dock as one approved by the zoning bylaws “for loading and unloading passengers and/or cargo and the tying up of dinghies.” FWR 10.04.

FWR 10.16(l)(h)(l) provides that “[n]o new docks or piers or extension of an existing dock or pier may be constructed on any portion of FEMA designated velocity zone (V-Zone) unless the applicant demonstrates that there will be public benefit from the project. The Commission shall weigh the potential likelihood of damage and harm that any such dock or pier would cause during a storm event with the public benefit demonstrated by the applicant in determining whether the project should be allowed.”

Great Harbors appealed to the Department of Environmental Protection which issued a Superseding Order of Conditions on April 5, 2008.

The review of the Commission’s decision effectively ends with the determination that it did not act arbitrarily or capriciously in finding that Great Harbors did not suffer a hardship. Therefore, the court does not reach Great Harbors’ arguments regarding the Commission’s findings bn FWR 10.13(l)(a) though FWR 10.13(l)(e).